**SOUTHWESTERN INDEMNITY COM-
PANY, Appellant,**

v.

**CIMARRON INSURANCE COMPANY,
Appellee.**

No. 3711.

Court of Civil Appeals of Texas.

Waco.

April 14, 1960.

Rehearing Denied May 5, 1960.

Beard, Kultgen & Beard, Waco, for appellant.

Turner, White, Atwood, McLane & Francis (L. Ray Pearce), Dallas, for appellee.

McDONALD, Chief Justice.

This is a suit brought by Southwestern Indemnity Company as plaintiff, against Cimarron Insurance Company to recover for losses incurred by Southwestern as a result of the fraud of one Rymer; the contention being that Cimarron had, with knowledge, partaken of the benefits of the fraud of Rymer. Rymer had been a local recording agent of both Southwestern and Cimarron. Cimarron cancelled its contract with Rymer in July, 1957, at which time Rymer owed Cimarron money for Cimarron's part of premiums collected by Rymer but not remitted to Cimarron. On December 31, 1957 Cimarron cancelled all its policies which Rymer had written. Cancellation was effective as of January 10, 1958. Because of the cancellation, the Cimarron policyholders were entitled to a refund of the unearned portion of the premium on their policies. Cimarron did not make this refund to the policyholders. Instead, it credited Rymer's account on its books. Rymer did not make any refund to the policyholders. Instead, he rewrote the policies (here involved), with Southwestern. At the time the Cimarron policies were rewritten in Southwestern, Rymer was insolvent. Shortly afterwards Southwestern discovered Rymer's financial condition and cancelled his agency contract. Southwestern then cancelled the policies Rymer had rewritten with it. Subsequently it paid return premiums on some of these policies and reinstated others. Southwestern sues Cimarron for the amount of return premiums it paid on the rewritten Cimarron policies, together with the amount of loss it suffered for premiums not paid to it by Rymer of the policies it reinstated.

Trial was to a jury which, in answer to special issues submitted by the court, found:

1) That Cimarron knew that Rymer could not pay the premiums owed on its policies at the time it cancelled such policies.

2) That Cimarron also knew Rymer would try to place the cancelled policies with other insurance companies.

3) That Cimarron knew Rymer would probably be unable to pay the premiums on the new policies.

4) That there was no reasonable probability that Rymer could pay Southwestern for the replacement policies which it wrote.

5) That Rymer knew that he could not pay for these policies.

6) That Rymer concealed his insolvency in order to induce Southwestern to write the new policies.

7) That Southwestern was unaware of Rymer's insolvency when it wrote the policies in question and would have cancelled Rymer's authority to write them, had it known the truth.

8) That Southwestern paid out $1,209.09 in return premiums on these policies.

9) That with respect to the policies which it reinstated, it suffered a loss of $2,086.67.

10) That Rymer had been instructed by Southwestern not to rewrite with it policies cancelled wholesale by another company, and

11) That Southwestern's acceptance of an assignment of a balance due Rymer from Cimarron was not a waiver of its rights against Cimarron.

The Trial Court, after receiving the foregoing verdict, refused plaintiff's motion for judgment on the verdict, and rendered judgment for defendant Cimarron, non obstante veredicto.

Southwestern appeals, contending that the Trial Court erred in rendering judgment non obstante veredicto for Cimarron and in refusing to render judgment for plaintiff because: a) Rymer defrauded Southwest-

ern and b) Cimarron was liable for Rymer's fraud.

Plaintiff, Southwestern, plead fully the factual situation here detailed. The proof fully sustains the pleadings. The only question presented being, whether, as a matter of law, relief is afforded in such situation.

■■■ The elements of fraud are: 1) misrepresentation of a material fact; 2) with intention to induce action or inaction; 3) reliance by the plaintiff; and 4) damage. Avery Co. v. Harrison Co., Com.App., 267 S.W. 254. To conceal where there is a duty to reveal amounts to misrepresentation. There is a duty to reveal where the relationship between the parties is one of confidence and trust. Long v. Martin, Tex.Civ.App., 234 S.W. 91, Er. Dis.

■■ There is no question but that Rymer practiced a fraud upon Southwestern. Rymer did not reveal his insolvency to Southwestern. He had such duty because he was the company's agent. Instead, he wrote insurance with them to replace wholesale cancellation of policies he had previously written in Cimarron Insurance Company, when he knew he was insolvent and could not remit Southwestern's part of the premiums. Southwestern suffered damages as the result of this fraud in the amount of $3,296.76.

■■ Cimarron is liable for Rymer's fraud if Rymer was Cimarron's agent, or if Cimarron knowingly benefited from the fraud. Cimarron contends that Rymer was not its agent since they had previously cancelled Rymer's agency contract. But when it cancelled the policies written through Rymer's agency, it became liable to the policyholders to pay the unearned premium. This obligation was due to the policyholders, not to Rymer. Cimarron did not pay its policyholders. It simply credited Rymer's account. Thus it in effect paid over the policyholders' money to Rymer. Rymer did not have authority from the policyholders to receive such payment. See Gulf Insurance Co. v. Beckville, Tex.Civ.App.1931, 38

S.W.2d 828 (W/E Ref.) When Cimarron credited Rymer's account with the return premiums, it in effect constituted Rymer its agent to handle the matter for it. The jury found that Cimarron expected that Rymer would discharge its liability to the policyholders by procuring new policies from another company. We think Rymer may well have been Cimarron's agent when he procured the Southwestern policies. However, under the undisputed factual situation, we think it becomes immaterial as to whether Rymer was Cimarron's agent, in that Cimarron becomes liable in any event for the reasons hereinafter set out. Cimarron set in motion the chain of circumstances which resulted in Southwestern's injury, and then accepted the benefit of the fraud practiced upon Southwestern by Rymer. If Cimarron had done that which it ought to have done, and was by law bound to do, that is, paid the policyholders the unearned premium due them on the policies which Cimarron was cancelling, Cimarron could not have been liable. But Cimarron knew Rymer was insolvent, and the only way it could ever collect from Rymer the money Rymer owed it was to credit his account with the unearned premiums due the policyholders, and "expect" him to rewrite the policies elsewhere, knowing he could not remit to the company amounts due for the policies so rewritten. It worked out in that manner, and Rymer rewrote the policies with Southwestern and in so doing, committed a fraud upon them. The jury so found and the record sustains such finding. Cimarron partook of the benefits of the fraudulent transaction practiced by Rymer upon Southwestern and became liable for the assets received. 20A Tex.Jur. p. 124, citing many cases, states:

"Partaking of the benefits of a fraudulent transaction ordinarily makes the participants principals and liable as such."

Brach v. Moen, 8 Cir., 35 F.2d 475, 482, expresses the rule thusly:

"Under the general rule it has been held that one knowingly accepting the

benefits of fraud is liable not only where he knew of and consented to the fraud at the time it was perpetrated, but also where he was personally innocent and had neither authorized nor known of the fraud at the time of its commission. The doctrine is most frequently applied where a principal accepts the benefits of his agent's fraud; *but liability under* the *doctrine may exist apart from the theory of agency."*

Our Supreme Court adheres to such rule in Pierce v. Fort, 60 Tex. 464; and this court in King v. Cliett, Tex.Civ.App., 1930, 31 S.W.2d 350, W/E Ref. holds that all who participate in a fraud, or who receive benefits from a fraud, are liable in damages to the party defrauded to the extent of the benefits received. As noted, Cimarron, in its zeal to collect the moneys due from the known insolvent Rymer, set in motion the chain of circumstances in which Rymer defrauded Southwestern. Then Cimarron accepted nearly $3,300 of the benefits inuring from such fraud. The record reflects that Cimarron expected Rymer to do exactly what he did. Cimarron knew that its loss was going to be shifted to plaintiff, or to some other insurance company similarly situated. This was equivalent to a knowledge of the fraud itself; and Cimarron thereafter participated in the benefits of the fraud. Cimarron knowingly benefited from Rymer's fraud and for such reason is liable for the benefits received.

We think that one should not profit by his own wrongdoing. Cimarron did not refund the unearned premiums to the policyholders, as was its duty to do when it cancelled the policies. That money belonged to the policyholders, and not to Cimarron and not to Rymer. But Cimarron knew Rymer was insolvent and the only way it could ever collect Rymer's debt to it was to credit these unearned premiums to Rymer's account, and "expect" that Rymer would issue policies with some other company to "take care of" the policyholders in lieu of the premium re-

fund to which they were entitled. Rymer did just this; he rewrote the policies with Southwestern when he knew he was insolvent and could never pay Southwestern its premiums for such policies. Southwestern never received any premium on these policies. *"On this particular snipe hunt, Southwestern was left holding the bag."* Cimarron, by its failure to repay the unearned premiums, set the stage for the fraud Rymer committed upon Southwestern. Indeed, Cimarron's officer, Hilgers, testified that when Cimarron did not refund the unearned premiums to the policyholders of the short cancelled policies, that they "expected" that Rymer would rewrite the policies in some other company. The record further reflects that Cimarron, in fact, cancelled the policies so that it could credit Rymer's account for the unearned premium, and effectuate collection of Rymer's indebtedness, otherwise uncollectable.

It is clear to us that Cimarron, by its conduct; by its failure to repay the unearned premiums to the policyholders entitled thereto, set in motion the chain of events which resulted in the loss suffered by Southwestern. Such loss was not only foreseeable, but Rymer's action was actually anticipated by Cimarron.

Cimarron knew Rymer was insolvent. Cimarron knew and anticipated that Rymer would, (and he did) rewrite the cancelled policies and defraud some other company. Cimarron, with knowledge and anticipation of the results, placed Rymer in position to do the very things that he did.

Cimarron participated in the overall transaction; it placed Rymer in a position where he could and did commit fraud on Southwestern; Cimarron had knowledge of the consequences; in fact it expected and anticipated to happen that which did happen; and then Cimarron accepted some $3,300 in benefits flowing from the fraud. We think Cimarron liable to the defrauded party to the extent of the benefits of the fraud received with the knowledge it had.

■ Moreover, we think, under the record before us, that Southwestern succeeded to an equitable subrogation of the rights for refund of the unearned premiums that the original Cimarron policyholders had against Cimarron at the time of cancellation. As noted, the facts herein detailed were *fully* plead. Such facts were sufficient to plead the doctrine of subrogation, although the word "subrogation" was never specifically used. Cimarron filed no special exceptions to Southwestern's pleadings. In the absence of special exceptions, the petition is liberally construed in the pleader's favor. Scott v. Gardner, 137 Tex. 628, 156 S.W.2d 513, 141 A.L.R. 50. The evidence in the cause is undisputed that Cimarron owed the policyholders the return premiums; that Cimarron did not pay same; that Cimarron expected the policyholders to be taken care of by Rymer's rewriting the policies in another company; that Rymer did in fact take care of the policyholders' rights for return premiums by rewriting the policies in Southwestern; and that Rymer defrauded Southwestern.

■ It is true that no issues were requested or submitted on the matter of subrogation as such. Submission of such issues and obtaining of favorable findings thereon were not here necessary, because the equitable subrogation was established by the record as a matter of law.

Our Supreme Court had a similar situation before it in Continental Nat. Bank v. Conner, 147 Tex. 218, 214 S.W.2d 928, 933. In that case the court said:

"The Conners finally deny the bank's right to assert its position as a holder in due course, because it failed to request a corresponding jury issue. Under Rule 279, R.C.P., such failure does not effect a waiver where the ground of recovery or defense in question is established as a matter of law, and we find it was so established in this case."

■ In the instant case we think that Southwestern, under the pleadings and evidence, succeeded to an equitable subrogation of the rights for refund of the unearned premiums that the Cimarron policyholders had against Cimarron at the time of cancellation, and that Southwestern's points on appeal are sufficiently broad as to be inclusive of the foregoing.

Defendant Cimarron makes 3 cross assignments of error. We have carefully considered same and all are overruled. The judgment of the Trial Court is reversed and judgment rendered for plaintiff, Southwestern Indemnity Company, for $3,294.67, with 6% interest from 25 June, 1959, and costs of suit.

Reversed and rendered.

WILSON, Justice (dissenting on rehearing).

I think the judgment of the trial court was correct. The majority imposes liability on Cimarron on (1) an agency theory and (2) "acceptance of benefits of the fraud." I am unable to find a basis for either theory under the record. Rymer was certainly not acting as Cimarron's agent in placing the policies with Southwestern. The holding by the majority that "when Cimarron credited Rymer's account with return premiums, it in effect constituted Rymer its agent to handle the matter for it," if it becomes law, will make it impossible in the industry for an insurer to credit a former agent's account without hazarding liability.

What did Cimarron do? It cancelled Rymer's authority to write policies. Of this action no complaint is made. It cancelled policies written by Rymer. This, the policies authorized. It credited Rymer's agency account with unearned premiums. These were obligations to its policyholders; not to Southwestern. The policyholders might well have a cause of action against Rymer or against Cimarron, but they are not parties to this action.

What duty did Cimarron owe to Southwestern? Did it owe a duty to notify every other insurer in the nation that it had cancelled Rymer's agency and policies

and had credited his agent's balance? Emphasis is placed on Cimarron's knowledge of Rymer's insolvency, and that it "expected Rymer would re-write the cancelled policies" in other companies. I take it to be common knowledge that when an insurer cancels, the agent usually seeks to place the business elsewhere. In this he acts as agent of the insured and the new insurer and not of the previous insurer. If this was ever regarded as a ground of liability by plaintiff, it was as a part of an alleged conspiracy (a count which was abandoned); and an allegation that Rymer could not probably pay the premiums on replaced policies. There is no suggestion in the pleading, aside from the abandoned conspiracy count, that Cimarron knew that Rymer would conceal his financial condition. Can it be seriously suggested that Cimarron was under a duty to disseminate information as to what it thought was Rymer's financial condition? I am unable to find any element of agency relationship in the case. The issue was not submitted to the jury. Appellee objected to its omission. It was waived. Rule 279.

As to the theory of accepting benefits of Rymer's fraud, the rule is invoked that partaking of benefits makes participants liable. The sine qua non of this rule is not acceptance of benefits, but participation. Cimarron did not participate in Rymer's alleged fraud. Rymer's "insolvency" or Cimarron's knowledge of it was not fraud. If Rymer concealed his insolvency from Southwestern, Cimarron did not participate in the concealment, for it had no duty to speak. If Rymer concealed the fact that the policies re-written were previously cancelled, Cimarron did not participate. The "fruits of the fraud" rule imposes no obligation on a stranger to the fraud for acts of another done purely in his own interest. Reeves v. McCracken, 103 Tex. 416, 128 S.W. 895, 896; American Nat. Bank v. Cruger, 91 Tex. 446, 44 S.W. 278; Ross v. Seip, 154 S.W.2d 958, writ ref. w. o. m.; Business Men's Oil Co. v. Priddy, Tex.Civ.App., 248 S.W. 408, writ dis. Cimarron did not participate,

consent, condone or ratify. It did nothing. Its relationship with Rymer had ended. No element of fraud on the part of Cimarron is present. Any "benefit" it received preceded any act of Rymer.

The opinion states that by crediting his account Cimarron in effect paid over the policyholder's money to Rymer. Even if this suit was by the policyholders (which it is not) the liability of neither Cimarron nor Rymer would be extinguished thereby. The credit transaction was solely inter sese, and affected their liability to third persons not one whit.

The opinion states Cimarron knew its loss would be shifted, and therefore knew of the fraud. I am unable to follow this syllogism. If it is based on the initial common knowledge that cancelled policies will probably be replaced, then such a rule would be disastrous to cancelling insurers. If it is based on Cimarron's duty to refund unearned premiums, this is not fraud as to appellant, nor is it evidence of knowledge any loss would be shifted.

On original submission I reluctantly concurred in the result on a "subrogation theory." As appellee's motion for rehearing points out, this theory was not pleaded. It has not ever been suggested as a basis for sustaining recovery in appellant's brief. I do not believe we are justified in initiating the theory at a time when appellee has no opportunity to meet it, nor notice he is called upon to combat it. Appellee has not regarded it as persuasive enough to suggest it. Before subrogation by implication of equity could be enforced in this case, appellee would be entitled to be apprised that the status of its obligation to former policyholders was in issue. This record does not present essential elements of subrogation as to appellee. The majority, I think, has imposed the equitable right to subrogation which appellee may well have had against Rymer, upon Cimarron, where it does not rest.

Rymer received the premiums. Most of these he did not remit to Cimarron.

Rymer was primarily obligated to repay unearned premiums. The obligation of Cimarron was secondary. Rymer's conduct placed Southwestern in its unfortunate predicament. Cimarron did nothing but what it had a right to do in crediting Rymer's balance. I see no basis for its liability and would affirm.

Memorandum Opinion

McDONALD, Chief Justice.

The original opinion in this cause is withdrawn and a new opinion handed down this date, substituted therefor.

Action on appellee's Motion for Rehearing will be held in abatement for 15 days, during which period appellee may file such further motions as it desires.