CIMARRON INSURANCE CO. V. SOUTHWESTERN INDEMNITY CO.

No. A-7910. Decided January 11, 1961.
Rehearing Overruled February 8, 1961)
(344 S.W. 2d Series 442)

*Turner, White, Atwood, McLane* and *Francis* and *Ray Pearce*, of Dallas, for petitioner.

*Beard, Kultgen & Beard* and *David R. Kultgen*, of Waco, for respondent.

MR. JUSTICE NORVELL delivered the opinion of the Court.

Southwestern Indemnity Company brought suit against Cimarron Insurance Company for the recovery of certain sums of money which it had lost because of the machinations of Jerry K. Rymer who at one time was a recording agent for both companies. The findings of a jury was generally favorable to the plaintiff, Southwestern, but the trial court rendered judgment non obstante veredicto that plaintiff take nothing. The Court of Civil Appeals, with one justice dissenting, reversed the judgment of the district court and rendered judgment for Southwestern upon the jury verdict for the principal sum of $3,294.67. See, South-

western Indemnity Company v. Cimarron Insurance Company, 334 S.W. 2d 831.

Writ of error was granted upon the points raised by the dissenting opinion, and after full hearing and argument, we have concluded that the judgment of the Court of Civil Appeals should be reversed and the judgment of the trial court affirmed. It will accordingly be so ordered.

This litigation grew out of Cimarron's action in cancelling its agency contract with Jerry K. Rymer and its subsequent cancellation of all Cimarron policies theretofore issued by Rymer. Automobile casualty insurance was primarily involved and some statement as to the business practices of casualty insurance companies is advisable.

The position of a recording agent to a large extent was originally fixed by custom and subsequently recognized by statute. Shaller v. Commercial Standard Ins. Co., 158 Texas 143, 309 S.W. 2d 59. Not only does a recording agent as the usual thing represent more than one insurance comany but in a sense he also represents the person buying insurance coverage. As a general rule, the purchaser of insurance does not select the insuring company put places an order for a particular type of insurance with the recording agent who then chooses the company which will carry the risk. When the agent issues a policy, he becomes liable to the insuring company for the premium charge, less his commission. The customer in turn becomes liable to the agent for the full amount of the premium. The agent controls the matter of extending credit to his customers. As suggested in one of the briefs, he may accept money, chickens or livestock if he sees fit. Settlements between agent and company are controlled by contract. The clause contained in the Cimarron contract with Rymer was one in general use and provides that:

"Accounts of money due the Company on the business placed by the Agent will be rendered monthly by the Company to the Agent. This Account will reach the Agent's Office by the tenth of the following month. The balance therein shown to be due the Company shall be paid not later than 60 days after the end of the month for which the account is rendered."

The Cimarron policies all contained the following standard cancellation clause:

"This policy may be canceled by the named insured by sur-

render thereof to the company, or any of its authorized agents or by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be canceled by the company by mailing to the named insured at the address shown in this policy written notice stating when not less than ten days thereafter such cancelation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender or the effective date and hour of cancelation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the compan yshall be equivalent to mailing.

"If the named insured cancels, earned premiums shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed ro rata. Premium adjustment may be made either at the time cancelation is effected or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation."

In July of 1957, Cimarron cancelled its agency contract with Rymer. At that time there were various policies outstanding issued by Rymer on behalf of Cimarron. On December 31, 1957 Cimarron, acting in accordance with the right of cancellation retained by it in the policies, gave notice of cancellation of all poliices issued by Rymer as its agent. This cancellation became effective as of January 10, 1958. It then credited Rymer's account with the unearned premiums of all these cancelled policies. This is all that Cimarron did. It did not pay to the various policyholders the amount of the unearned premiums on the cancelled policies.

Immediately after Cimarron's cancellation, Rymer, as a recording agent for Southwestern, re-wrote the policies with that company, that is, he issued Southwestern policies in lieu of the Cimarron policies and delivered them to his customers. These policies were in general for the unexpired period of the time orginally covered by the cancelled Cimarron policies. Rymer largely circumvented the demand for the unearned permiums on the cancelled Cimarron policies by issuing new Southwestern policies and extending credit to his customers for the premiums charged therefor. By this method, he was able to offset the refund claims on the Cimarron policies by the premium charges made for the new policies which he issued for Southwestern.

Rymer never paid Southwestern for the premiums upon the policies issued in lieu of the cancelled Cimarron policies. He was

adjudged bankrupt and some $40,000 in claims were asserted against him by Southwestern.

Some explanation should be made of the bookkeeping practices employed in managing the Cimarron account with Rymer. When a policy was issued, Rymer's account was debited with the premium therefor, less the recording agent's commission. When a policy was cancelled the unearned premium was credited to the recording agent's account. This account was one between the company and its agent and had nothing to do with the company's liability to policyholder's claims for the return of unearned premiums on cancelled policies. Obviously, when the agent's account was credited with unearned premiums it was upon the assumption that the agent would account to the policyholder for the unearned premium. We are here concerned primarily with bookkeeping entries. For example Cimarron's books showed Rymer to be indebted to the company in the sum of $2,536.96 before the policies were cancelled. After cancellation, the books showed a credit balance of $1,700 to $1,800 in Rymer's favor. This account had nothing to do with actual collections of premiums from policyholders.

As pointed out in the opinion of the Court of Civil Appeals, the jury made the following findings with reference to Cimarron:

(1) Cimarron knew that Rymer could not pay the premiums owed on its policies at the time it cancelled such policies.

(2) Cimarron knew that Rymer would probably try to place the cancelled policies with other insurance companies.

(3) Cimarron knew or should have known that Rymer would be unable to pay the premiums on the new policies.

The remaining findings relate to the financial standing of Rymer; various actions taken by him and Southwestern; the knowledge Southwestern had of Rymer's financial condition and the like.

The case then comes down to this: In view of the circumstances that Cimarron, upon the cancellation of its policies issued by Rymer, did not pay the amounts of the unearned premiums thereon to the holders of such cancelled policies, can liability against Cimarron in favor of Southwestern be fixed because, (1) Cimarron cancelled the policies written by Rymer, (2) knowing that Hymer could not pay the premiums and that, (3) he

would probably re-write the policies in another company, (4) for which he would be unable to pay the premiums charged therefor, in view of the circumstances that Cimarron did not pay to its policyholders the unearned premiums on the policies which it cancelled.

Three theories of liability are suggested, namely:

(a)  That Cimarron is liable because it accepted the benefits of a fraud which Rymer committed against Southwestern.

(b)  That Southwestern is subrogated to the rights of the holders of Cimarron's cancelled policies to require Cimarron to make return of unearned premiums.

(c)  That as Cimarron did not return the unearned premiums to the policyholders, but credited Rymer's account therewith, it in legal effect made Rymer its agent for the purpose of acquiring insurance coverage from Southwestern to take the place of that cancelled by Cimarron, and hence is liable to Southwestern for the wrongs which Rymer committed against it.

Under the facts of this case, absent a finding of agency, liability against Cimarron cannot be predicated upon the theory that it accepted the benefits of Rymer's fraud against Southwestern which operated to forestall the filing of policyholders' claims against Cimarron for unearned premiums. In cancelling its policies, Cimarron was exercising a contract right and while under certain conditions the mere exercise of such a right may set events in motion which result in a financial loss to a third party, there must be more than the circumstance of loss upon which to predicate liability.

The facts of a 1913 Civil Appeals case are somewhat similar to those disclosed by the present record. In Wichita Falls Compress Co. v. W. L. Mody & Co., 154 S.W. 1032, wr. dis. by agreement, it appeared that Hudspeth, Alexander & Co. had sold some compressed half bales of cotton to W. L. Moody & Co., and represented them to be full bales. The drafts attached to the cotton were paid to City National Bank of Bowle, Texas which credited the proceeds thereof to a $30,000 indebtedness owed by the Hudspeth Company to the bank. In the absence of a showing of agency or other participation in the fraud perpetrated by the Hudspeth Company, the bank was held not liable.

Similarly, in Reeves v. McCracken, 103 Texas 416, 128 S.W.

895, this Court held that a vendor who had agreed to convey to a vendee or his nominee, could not be held liable for the fraud of the vendee in negotiating a subsequent sale of the property, although the vendor conveyed directly to his vendee's purchaser. The element of agency and hence participation was lacking, even though in a sense, the vendor, by receiving the vendee's purchaser's notes had realized some advantage or benefit from the transaction. See, also, 20A Texas Jur. 122, Fraud and Deceit, Sections 63, 64.

Laying aside all questions of the adequacy of the pleadings and the points of error in the Court of Civil Appeals to raise the question, we do not regard the development of the evidence as being legally sufficient to support a judgment against Cimarron on the theory of equitable subrogation. Numerous policies were involved and any fixing of liability under a subrogation theory would involve the examination of the policyholders' accounts with Rymer, the recording agent. These accounts are not before us and hence we cannot ascertain which policyholders had actually paid for their policies or were merely indebted to Rymer for them.

Under any subrogation theory the rights of Southwestern cannot arise above those of the holders of the cancelled Cimarron policies. Unless the premiums were actually paid for by the policyholders, they could acquire no right in equity which would prevent the amount of the unearned premium of a policy from being credited to Rymer's account with Cimarron upon cancellation of the policy. The policyholder having paid nothing would not be entitled to an equity upon which a subrogation could be based. There are perhaps other reasons why the theory of subrogation is not applicable here, but further discussion of the theory may be pretermitted.

The argument primarily stressed by respondent in its reply to the application for writ of error is that under the facts and circumstances of this case, Rymer, as matter of law,[1] was the agent of Cimarron in procuring the policies from Southwestern and thus forestalling claims against Cimarron for the return of unearned premiums. It is urged that, "Rymer became the agent of Cimarron for the purpose of refunding the money of the policyholders or getting other insurance for them," and that the evidence shows "that replacement of policies by agents is common practice upon cancellation; * * * that cancellation and crediting return premiums to an agent's account will frequently wipe out

1.—No issue inquiring if Rymer was the agent of Cimarron was submitted to the jury.

a balance owed by the agent to the company. This being the case, when a company finds that one of its agents who owes it money is in financial difficulty, the temptation is to cancel the policies which the agent has written and hope he will replace them. If he does, the prospective loss from his bad debt will be shifted to somebody else. A rule which inhibits this dubious practice is far more salutary than dangerous."

We are unable to agree with this argument. We have set out the means and methods by which casualty insurance companies and recording agents carry on their business operations. The agent's account mentioned by respondent is a book account between company and agent. Actually what the company gains by the cancellation of a policy is relief from a particular risk. This, of course, entails an adjustment of the book account between the company and the agent. The cancelling company does not, however, by exercising its contract right shift its debt to another company. Nor can it be said that the exercise of the contract right of cancellation is affected by knowledge that the recording agent will attempt to re-write the policies in other company. We take it that this is not an unusual practice. The recording agent is under some form of economic compulsion to re-write the cancelled insurance if he wishes to remain in business. An insurance company having doubts as to the financial responsibility of one of its recording agents is not duty bound to communicate these doubts to other companies who are also represented by such agent. Phillips Petroleum Company v. Denial Motor Company, Texas Civ. App., 149 S.W. 2d 979, wr. dis., judgm. cor., and authorities therein cited. Such a course might be dangerous. Mistakes are often made as to the financial responsibility of organizations and individuals. However that may be, under a free economy and absent some public policy consideration, one is allowed to act according to his own lights and doubts and exercise his rights in accordance with the contracts he has made. Here it was not shown that Cimarron did more than it was lawfully entitled to do under its contracts. It has not shown that Cimarron induced or participated in a breach of instructions or fraud committed by Rymer in issuing the Southwestern policies. Ross v. Seip, Texas Civ. App., 154 S.W. 2d 958, wr. ref. w.o.m., Hawkins v. Campbell, Texas Civ. App., 226 S.W. 2d 891, wr. ref., n.r.e. Respondent's theory of liability is resourceful and is well presented and buttressed by the opinion of the Court of Civil Appeals but we are constrained to reject it as impractical and difficult if not impossible of application. We cannot accept the thesis that despite the cancellation of Rymer's agency contract and despite the cancellation of all Cimarron policies issued by him, he nevertheless remained

the agent of Cimarron for the purpose of procuring insurance policies from Southwestern to take the place of those cancelled by Cimarron.

The judgment of the Court of Civil Appeals is reversed and the judgment of the District Court is affirmed.

Associate Justice Steakley not sitting.

Opinion delivered January 11, 1961.

Rehearing overruled February 8, 1961.