**TEXAS FIRST NATIONAL
BANK, Appellant,**

v.

**Herbert NG and Kenneth
Wu, Appellees.**

No. 14–03–00142–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

March 3, 2005.

Opinion Denying Rehearing
June 2, 2005.

Rehearing and Rehearing En Banc
Overruled July 14, 2005.

T. Michael Neville, Rachel Kurian Seshan, Lynne Liberato, Houston, for appellant.

Gary M. Jewell, William W. Rucker, Kevin Dubose, Andrew Patrick Parma, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices FOWLER and SEYMORE.

## OPINION

ADELE HEDGES, Chief Justice.

This case involves alleged improprieties in the handling of one client's accounts at Texas First National Bank. TFNB sued its former chairman, Kenneth Wu, alleging that he breached his fiduciary duty to the bank, and sued its former senior vice president, Herbert Ng, alleging that he committed fraud and breached his fiduciary duty. After a jury trial on certain issues and a bench trial on others, the trial court entered judgment that (1) TFNB take nothing on its claims against Wu, (2) Wu is entitled to indemnification from TFNB, and (3) TFNB is entitled to specified damages from Ng.

All three parties have appealed. In his appeal, Ng contends that (1) the evidence is insufficient to support the jury's finding that he committed fraud; (2) the evidence is insufficient to support the finding that he breached his fiduciary duty; (3) the trial court erred in not applying the ratification finding to negate the fraud finding;

(4) the trial court erred in refusing to submit a question concerning TFNB's liability for fraud; and (5) he is entitled to indemnity from TFNB. In his appeal, Wu contends that the evidence is insufficient to support the jury's finding that he breached his fiduciary duty. In its appeal, TFNB contends that the trial court erred in (1) granting a take-nothing judgment favoring Wu based on the jury finding that TFNB ratified Wu's conduct and (2) awarding indemnification to Wu.

We affirm the judgment against Ng on fraud. Because we find that the evidence is legally insufficient to sustain the ratification finding, we reverse the judgment for Wu on the breach of fiduciary duty claim and indemnification and remand for entry of a new order in accordance with this opinion. For the sake of cohesion and comprehension, we will first present a general time line of events. We will then discuss the liability issues concerning Ng and Wu, the ratification issues, and the jury charge issue raised by Ng.

## I. Time Line

The allegations in this lawsuit all concern conduct regarding one of TFNB's customers: Alyna, Inc., owner of a chain of convenience stores. In 1998, TFNB had several outstanding loans to Alyna, and Alyna had several accounts with TFNB. Herbert Ng was the loan officer for the Alyna loans. By summer 1998, the Alyna loans and accounts had become problematic: loan payments went uncollected and checks deposited by Alyna from its accounts in other banks were being returned for insufficient funds.

## A. The Money Orders

In July 1998, Alyna began depositing money orders in its TFNB accounts. When Ng became aware of this practice, he asked Alyna's owner, Riyaz Nathoo, about it. Nathoo told Ng that the money orders were mistakes: either returns from customers or printing errors by the machines. According to Nathoo, when a money order was printed at one of Alyna's stores, the money order company, FFP, Inc., was electronically notified and could then automatically take funds from Alyna's TFNB accounts; in order to cancel out the automatic draws, the money orders needed to be deposited into the accounts. However, it was learned much later that Alyna was apparently playing the float between the date of issuance for the money orders and the date of the automatic draw to FFP, which usually amounted to several days.[1]

Throughout July, money orders poured into the Alyna accounts, many made out to Alyna or entities affiliated with Alyna. There was testimony from several sources that because of the uncollected status of the Alyna loans, Ng had to review the daily deposits himself, although Ng denied that he did this or was supposed to do it. Regardless, Ng frequently gave Alyna immediate credit on its deposits (including the money orders) so that it could pay its bills.

In early August, when Alyna began to have problems paying for the money orders, someone at FFP contacted Ng, told him that Alyna was behind in its payments, and requested that he freeze the Alyna accounts and turn the money over to FFP.[2] Alyna agreed to give FFP $200,000

---

1. As one witness phrased it at trial, Alyna was stealing the use of money from FFP.

2. There is considerable bickering in the briefs and in the record regarding whether Ng was told in this conversation that Alyna was "out of trust," although Ng admitted that he was "essentially" told that Alyna was out of trust.

in payment for the money orders, and, on August 5, Ng approved the issuance of a cashier's check drawn from Alyna's accounts.[3]

However, after a teleconference between Ng, Michael Massey (TFNB's outside counsel), Greg Kramer (president and CEO), and David Chung (manager of the bookkeeping department), it was decided to stop payment on the cashier's check because FFP had stopped payment on money orders deposited in Alyna's accounts. The theory, according to Ng, was that TFNB owed a fiduciary duty to pay the cashier's check, and FFP had a fiduciary duty to pay the money orders; by stopping payment on the cashier's check, it was believed that it would give TFNB leverage to negotiate with FFP. During the decisive teleconference, Ng did not disclose the true nature of the money orders deposited in Alyna's account (*i.e.*, that no one had ever paid for them); in fact, there is no evidence Ng ever told anyone at TFNB about the true nature of the money orders.[4]

Ultimately, FFP sued TFNB and Alyna, alleging that Alyna had breached its trust with FFP, and that TFNB had participated in the breach, had made negligent misrepresentations, and had unlawfully refused to pay the cashier's check. In 2000, during a deposition related to this prior litigation, Ng revealed that he knew Alyna had been depositing money orders in its

accounts and gave his claimed understanding that the money orders had to be deposited to cancel out the automatic draws. According to David West, an attorney who represented TFNB in the FFP lawsuit, Ng's deposition remarks "cut our throat." After a jury trial, judgment was entered against TFNB for $441,587.71 in actual damages plus pre- and post-judgment interest and attorney's fees.[5]

## B. The Overdrafts

Meanwhile, on August 19, 1998, Kenneth Wu became chairman of TFNB's board of directors and chairman of its executive committee, which acted as a loan committee. As will be discussed in detail below, there was considerable testimony that Wu usurped the authority of TFNB's president and CEO, Kramer, thus preventing the latter from effectively supervising Ng.

When FFP ceased honoring money orders deposited in the Alyna accounts, the accounts became overdrawn. Ng opened three new accounts for Alyna and permitted it to regularly overdraft them for significant amounts. From September 1998 through February 1999, the Alyna accounts were consistently overdrawn. According to Ng, the TFNB "action plan" was to try to keep Alyna's convenience stores operating so that they could be sold at a higher value and the loan balances reduced. Indeed, at one point, four of

---

3. To cover the amount of the check, on August 3 and 4, Alyna deposited $110,000 in cash, checks from other Alyna accounts totaling almost $60,000, about $14,000 in FFP money orders, and checks from third parties amounting to over $18,000. The check issued on August 4 and was debited on August 5. Michael Klobosits, TFNB's internal auditor, testified that in order for the funds deposited on the 3rd and 4th to be available on the 5th, Ng, as the Alyna loan officer, would have to have reviewed the items and "force paid" the noncash deposits, thus giving Alyna immediate credit for items that had yet to clear. Ng,

however, denied that he reviewed these deposits.

4. In his testimony, Ng consistently asserted that at the time he saw nothing wrong with the deposited money orders.

5. The jury found $711,293.80 in actual damages, but this figure was reduced based on FFP's failure to mitigate. The amount of attorney's fees was calculated to be $334,000 through trial, plus additional amounts if the case was appealed.

Alyna's ten stores were sold, and the loan balance was reduced. Ng testified that, during this period of time, he kept in daily contact with Alyna's owner so he could monitor the funds coming in and out of the account and grant immediate credits and overdrafts as required to keep the stores operating. In doing so, Ng greatly exceeded his official authority to authorize overdrafts; however, Ng claimed that he had approval from the board of directors and the executive committee to exceed those limitations.

The board of directors was informed about the so-called action plan through inclusion of Alyna's loans in a monthly Watch List of troubled loans. Beginning in September 1998, the Watch List indicated that the stores were to be kept open while a buyer was being sought. The September Watch List included a notation, made at Ng's direction, that the overdraft was "fully covered by a provisional credit under the bank's control." This notation dropped off the Watch List in later months, although there remained an indication that the overdrafts might be recovered through certain offsets (which apparently referred in part to the hope of settling the FFP lawsuit and regaining a portion of the cashier's check). The board was also kept apprised of the accounts' overdraft status both in the Watch List and the monthly Overdraft Report. It was hotly disputed at trial whether by "approving" these reports, the board was simply approving the preparation of the reports or whether it was actually approving the "action plan" and the overdrafts.

In February 1999, American First National Bank discovered that Alyna had been kiting checks between itself and TFNB.[6] AFNB stopped payment on the outstanding checks, on which Ng had already granted immediate credit, and the overdraft amounts soared. Ultimately, TFNB lost over $500,000 in unrecovered overdrafts.

## C. The Lawsuit

TFNB sued Ng and Wu. Against Ng, TFNB alleged that by making misrepresentations of fact to his superiors and failing to disclose other material facts he committed fraud and breached his fiduciary duty. Ng denied these allegations and contended that his actions were ratified by his superiors, the board, the executive committee, and the shareholders. Against Wu, TFNB alleged that he used his position as chairman to usurp Kramer's authority as CEO and president and to permit Ng to recklessly handle the Alyna accounts thus resulting in the overdraft losses.[7] Wu denied these allegations and contended that his actions were ratified.

The jury found that Ng committed fraud against TFNB, Ng and Wu both breached their fiduciary duties to TFNB, and the conduct of both men caused TFNB to incur damages. The jury found that TFNB ratified the conduct of both Wu and Ng but did not waive its right to seek damages against either of them. The jury further

---

6. As explained by one of the experts at trial, check kiting occurs when a "kite artist" uses checks drawn on his or her account at one bank to cover checks written on his or her account at another bank, and vice versa, so that a circle is created in which no money is actually being deposited in either bank. Check kiting is illegal, and it requires the grant of immediate credit from both banks on the deposited checks from the other bank.

Once one of the banks refuses to grant immediate credit (as AFNB did here), the kite collapses.

7. At trial, TFNB also attempted to tie Wu to the losses incurred in the FFP litigation; however, the jury awarded only $1 in damages against Wu based on that lawsuit. The parties raise no issues concerning Wu and the FFP litigation.

found that two other TFNB officers also breached their fiduciary duties: Gregory Kramer, who was TFNB's CEO and president, and Tom Tsao, who was chief cashier.[8] The jury apportioned liability between Ng, Kramer, and Tsao as follows: 50 percent as to Ng, 20 percent as to Tsao, and 30 percent as to Kramer.[9]

The trial court heard the indemnification issues. It found that Ng was not entitled to indemnification, but concomitantly, Wu was entitled to indemnification. In drafting its final judgment, the trial court apparently determined that the ratification finding nullified the breach of fiduciary duty findings but did not affect the fraud finding against Ng. The court awarded a take-nothing judgment on TFNB's claims against Wu; ordered Ng to pay TFNB $180,022.96 in damages plus pre- and post-judgment interest; and ordered TFNB to pay Wu $475,705.44 in attorney's fees and litigation expenses related to trial, plus additional amounts in the event of appeal to this court or the Texas Supreme Court, as well as post-judgment interest.[10]

## II. Liability Against Ng

### A. Fraud

█ In his first issue, Ng contends that the evidence is legally and factually insufficient to support the jury's finding that he committed fraud against TFNB. In considering these sufficiency challenges, we utilize the normal standards of review. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2003) (legal sufficiency); *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998) (factual sufficiency). Because Ng does not challenge the fraud question on appeal, we consider the evidence in light of the charge as given. *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex. 2000). In response to Question No. 5, the jury found Ng committed fraud.[11] The question contained instructions regarding both fraudulent nondisclosure and fraudulent misrepresentation. In answer to Question No. 7, the jury found that Ng's fraud caused TFNB damages in the amount of $200,000 for the loss in the FFP lawsuit and $103,139.05 for the loss in

8. Kramer and Tsao were not defendants at trial.

9. Wu was not included in the proportionate liability question.

10. The court broke the fees and expenses down as follows: (1) $390,000 as attorney's fees and expenses related to trial; (2) $60,000 for expert witness costs; (3) $21,750 for litigation support costs; (4) $3,955.44 for copying costs; (5) $45,000 in the event of an appeal to the court of appeals; and (6) $15,000 in the event of an appeal to the supreme court.

11. Question No. 5 asked the jury as follows:
Did Herbert Ng commit fraud against Texas First National Bank?
Instructions: Fraud occurs when____
a. a party makes a material misrepresentation
b. the misrepresentation is made with knowledge of its falsity or made reckless-

ly without any knowledge of the truth and as a positive assertion
c. the misrepresentation is made with the *intention* that it should be acted on by the other party, and
the other party acts in reliance on the misrepresentation and thereby suffers injury.
Instructions: Fraud also occurs when____
a. a party fails to disclose a material fact within the knowledge of that party,
b. *the party knows [that] the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,*
c. The party intends to induce the other party to take some action by failing to disclose the fact, and
d. The other party suffers injury as a result of acting without knowledge of the undisclosed fact.
Definition: Misrepresentation means a false statement of fact.

overdrafts. We discuss each of these in turn.

### 1. Fraudulent Nondisclosure & the FFP Lawsuit

In its suit against TFNB, FFP alleged that TFNB had participated in Alyna's breach of trust, had made negligent misrepresentations, and had unlawfully refused to pay a cashier's check. In the present lawsuit, TFNB alleged that Ng committed fraud against it by failing to disclose certain material facts, *i.e.*, that no one had paid for the money orders deposited in Alyna's accounts (and on which he granted immediate credit) and that many of them were made out to Alyna or affiliated entities. TFNB further alleged that this failure to disclose caused damages in the FFP litigation. These allegations fit within the fraudulent nondisclosure portion of the court's charge. Thus, TFNB was required to prove that Ng (1) failed to disclose a material fact that was within his knowledge, (2) knew that TFNB did not possess that knowledge and did not have an equal opportunity to discover it, and (3) intended to induce TFNB into taking some action by his failure to disclose, and (4) that TFNB suffered injury as a result. Ng attacks the proof regarding the second and third elements.

■ Regarding the second element, Ng contends TFNB had an equal opportunity to discover the truth because other officers and employees had access to the deposit records. However, this argument ignores the fact that Ng was the loan officer on the account, he was a senior vice president, and there was testimony that he reviewed the daily deposits in the account (including the money orders) and that he had to approve immediate credits on the money orders before the cashier's check could be issued. Further, there was testimony that other TFNB officers and employees relied on Ng for information on the Alyna accounts and that such reliance was reasonable in the industry. Indeed, this appears to be exactly what Kramer and Massey were doing during the teleconference concerning the cashier's check—relying on Ng for information. The evidence clearly supports the conclusion that other TFNB officers and employees did not have an equal opportunity to discover the truth regarding the money orders.

■ Ng next argues that TFNB failed to prove he knew that the nature of the money orders was material during the relevant time period, *i.e.*, when he met with Kramer and Massey and the decision to stop payment on the cashier's check was made. This argument appears to pertain to the third required element that Ng must have intended to induce TFNB into taking some action.[12] Knowledge and intention of a party often defy direct evidence; thus, a jury may rely on circumstantial evidence in making these determinations. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (intent to defraud); *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 924 (Tex. App.-Fort Worth 1994, writ denied) (knowledge of defendant in fraud case). Here, there appears to be no direct evidence that Ng intended TFNB to act a certain way. In his testimony, Ng insisted that at the time the cashier's check was stopped, he thought the deposit of money orders was an acceptable practice. However, the jury may have reasonably concluded that this assertion was not credible given the evidence that (1) FFP had complained to Ng about Alyna's fail-

---

**12.** There is no express requirement in the charge that Ng must have known the informa- tion was material.

ure to pay for money orders, (2) FFP had demanded TFNB freeze Alyna's accounts, and (3) Ng reviewed the daily deposits and thus would have known that many of the money orders were made out to Alyna or entities related to Alyna.[13] Since the conversation between Ng, Kramer, and Massey was about whether to stop payment on the cashier's check, it could also be inferred that by not disclosing the nature of the orders, Ng intended for TFNB to stop payment.[14]

As a factual sufficiency argument, Ng further questions how he could have known that the undisclosed fact was material when TFNB's own attorney in the FFP lawsuit acknowledged that the harmfulness of Ng's deposition became apparent only when trial was imminent.[15] However, the attorney's testimony suggests little about the basic materiality of Ng's knowledge; he averred only that it became apparent close to trial that Ng's unrevealed knowledge *would decide the case.* Thus, even in light of the attorney's comments, the jury could have reasonably determined that Ng realized that this knowledge was material. Based on the foregoing, we find that each of Ng's sufficiency arguments regarding his alleged fraudulent nondisclosure is without merit.

## 2. Fraudulent Misrepresentations & the Alyna Overdrafts

In September 1998, Ng reported in the monthly Watch List Report submitted to the Board of Directors that "[t]he overdraft [on the Alyna accounts] is fully covered by provisional credit." TFNB alleged that this representation was fraudulent and persuaded the Board to not cut off the overdrafts. These allegations fit within the fraudulent misrepresentation portion of the court's charge. Thus, TFNB was required to prove that Ng (1) made a material misrepresentation to TFNB, (2) with knowledge of its falsity or recklessly without any knowledge of the truth and as a positive assertion, and (3) with the intention that TFNB should act on the misrepresentation, and (4) that TFNB acted in reliance on the misrepresentation and thereby suffered harm.[16] Ng attacks the suffi-

13. Additionally, there was evidence that at least three different TFNB employees warned Ng about the Alyna accounts. Carrie Chin, a long-time teller, testified that she told Ng "[t]his account is not good," she questioned him as to why he always approved items on the account, and he just told her not to worry because he would take care of the account. Tsao, the chief cashier, testified that he told Ng he suspected check kiting on the Alyna accounts. Ng denied the warning from Chin and Tsao, but he admitted that Kramer warned him about giving immediate credit on uncollected funds to Alyna.

14. Indeed, there was testimony that had the information been known, the situation involving Alyna and FFP would have been handled very differently. There was also a suggestion in the record that Ng called FFP's charges against Alyna "nonsense" during the conversation but still did not reveal Alyna's deposit of money orders payable to itself. This may suggest Ng also made a material misrepresen-

tation, but because we find that the evidence was sufficient to support the verdict on the material nondisclosure theory, we need not address the misrepresentation theory as it pertains to the FFP litigation.

15. This issue also appears to address the third element of fraudulent nondisclosure. *See supra* n. 12.

16. There was also evidence that the board and the committee would have acted very differently in regard to Alyna had they known of its (and Ng's) conduct in relation to the money orders deposited in its accounts. Thus, the jury could have also concluded that Ng committed fraud by failing to disclose the truth regarding the money orders and that this proximately caused the overdraft losses. However, because we find that the evidence was sufficient to support the verdict on the fraudulent misrepresentation theory, we need not address the nondisclosure theory as it pertains to the overdrafts.

ciency of the evidence on all four elements of fraudulent misrepresentation.

 Regarding the first element, Ng contends that any misrepresentation regarding provisional credit was not material because, when the statement was removed from the October Watch List, the "action plan" regarding Alyna stayed the same. "Material" was not defined in the charge, but has been defined as "substantial," "noticeable," and "relevant." THE NEW AM. HERITAGE DICTIONARY 772 (2d College ed.1991). There are at least two reasons why the jury could have reasonably considered the statement to be material, even assuming the board did not change the approach to the overdrafts after the statement was removed. First, there is no evidence that the falsity of the statement was ever disclosed, nor was it revealed in subsequent Watch Lists that the overdraft was no longer fully covered by a provisional credit. It is therefore possible that the board could have continued to believe the credit still existed.[17] Second, having started the action plan in September with the allowance of overdrafts, TFNB had sunk costs associated with the plan; consequently, by the time the notation was removed, the situation had substantially changed. In other words, the provisional credit statement started the ball rolling regarding the overdrafts, and once begun, it would have been difficult to shut them down. Thus, the jury could have reasonably concluded that the statement was material, and Ng's argument to the contrary is without merit.

 Next, Ng contends that the statement regarding provisional credit was accurate when made. This argument relates to the first and second elements of fraudu-

lent misrepresentation. There was evidence that the overdrafts totaled $108,000 at the time the Watch List statement was made. Ng contends that, as part of the provisional credit, he was counting on (1) $75,000 in late return items (apparently including FFP money orders that were not disputed), which were eventually credited to Alyna's accounts, and (2) $45,000 in disputed money orders that he included on the alleged advice of counsel. The only record support offered for the claim that the first set of items eventually cleared is Ng's own testimony. Because this testimony was uncontroverted, it may have been sufficient to established that these items did in fact cover the overdraft for up to $75,000. However, regarding the second set of items, even if the attorney advised Ng that he could include the items in the provisional credit, the attorney would have done so in ignorance of the true nature of the money orders deposited in Alyna's account. Indeed, there is no evidence that anyone at TFNB other than Ng knew that the deposited money orders had never been paid for and that many were made out to Alyna or affiliated entities.

 Regarding the third element of fraudulent misrepresentation, Ng contends that there was no evidence regarding any intent on his behalf to cause the Board to act in any particular way. This argument begs the question. Clearly, if the jury believed that Ng misrepresented that the overdrafts were covered by provisional credit, they could have logically inferred from this that Ng intended the board to permit the overdrafts. Intent may certainly be proven by circumstantial evidence. *Mladenka v. Mladenka*, 130 S.W.3d 397, 405 (Tex.App.-Houston [14th Dist.] 2004, no pet.).[18]

---

**17.** Indeed, subsequent Watch List notations indicated that at least $75,000 of the credit would be available by a particular date and that the bank's attorney would be consulted regarding using the cashier's check as an

offset to the overdrafts. These statements do not negate the notion that the overdrafts were still fully covered.

**18.** Ng also raises an issue regarding motive. If the jury believed, as it apparently did, that

■ Regarding the fourth element, Ng contends that Kramer knew exactly what was occurring with the credits; thus, Ng could not have been held to have defrauded TFNB. This argument fails for several reasons. First, besides one record citation, it is not developed with authority or explanation. *See* TEX.R.APP. P. 38.1(h) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Second, the record cite Ng provides is to his own testimony wherein he suggested that Kramer was aware that the provisional credit was based on deposited money orders; however, Ng does not claim that Kramer knew the nature of the money orders. Thus, Kramer lacked information essential to determining the truth of Ng's Watch List statement.[19] And third, the argument ignores the fact that the jury found Kramer was also culpable for TFNB's damages. In other words, the jury apparently did consider that Kramer may have acted improperly, but the jury refused to find that Kramer's actions completely exonerated Ng. Based on the foregoing, we find that each of Ng's sufficiency arguments regarding the alleged fraudulent misrepresentations is without merit.

### 3. Ng's Additional Arguments Regarding the Fraud Finding

Finally, Ng presents three reasons he claims TFNB cannot prevail on its fraud claims even if he did mislead TFNB: (1) he was an employee of TFNB and a corporation cannot defraud itself; (2) Alyna's fraudulent acts, not his, were the proximate cause of TFNB's injuries; and (3) TFNB did not prove it's reliance was justified. We discuss each argument in turn.

■ Ng first contends that his actions could not have defrauded TFNB because a corporation cannot defraud itself and, at all times relevant to this case, he was operating within the course and scope of his employment with TFNB. This argument is waived by failure to preserve it in the trial court and failure to properly present it on appeal. Ng neither requested nor obtained a finding that he was acting in the course and scope of employment. TEX.R.APP. P. 33.1(a).[20] He also fails to provide any argument or record citations for his claim that he was always acting in the course and scope. TEX.R.APP. P. 38.1(h). Further, he relies heavily on tortious interference cases to make the argument that an employee cannot defraud his or her employer, and these cases are readily distinguishable. In *Holloway v. Skinner*, appellant's primary citation, the court held that a third-party claim for tortious interference against a corporate officer could only be successful if the party showed that the officer acted so contrary to the best interests of the corporation that the actions could only have been motivated by personal interests. 898 S.W.2d 793, 796 (Tex.1995). The policy rationale underlying this rule is that corporate officers should be free to advise the corporation without fear of a third party claiming that the advice interfered with their con-

Ng put TFNB in this situation by improperly accepting the money orders into the accounts and granting immediate credit on them, it would be a reasonable conclusion that he then wanted to find a way out of the mess by keeping the stores operating in the hope that a generous sales price would make everything come out all right. Thus, the jury could have concluded that Ng did have a motive in mis-

representing the true facts to the board and an intent to do so.

19. The true nature of the money orders suggests that FFP would never have paid them; thus, they could not have been part of a credit to Alyna or TFNB.

20. Nor was this issue raised in Ng's motion for new trial.

tractual relation with the corporation. *Id.* at 795. Such rationale does not apply in the present situation where an officer is being charged with defrauding the corporation itself. Furthermore, even if Ng is correct that his conduct should have been judged under this "personal interest" standard, he did not request that such an instruction be included in the charge; thus, he waived the argument. Tex.R.App. P. 33.1(a).

■ Ng further contends that the cause in fact of TFNB's damages was Alyna's decision to engage in various fraudulent acts, citing *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 498 (Tex.1995). In making this argument, Ng misconstrues the nature of proximate cause and the import of *Peeler*. The trial court defined "proximate cause" in the jury charge as "that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred." *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991) (stating that conduct is a cause if in a natural and continuous sequence it produces an event and without it the event would not have occurred); *Cathey v. Meyer*, 115 S.W.3d 644, 663 (Tex.App.-Waco 2003, pet. filed) (defining proximate cause similarly in fraud context). The charge further recog-

nized that there can be more than one proximate cause under Texas law. *See Lear Siegler*, 819 S.W.2d at 471. Although Alyna's activities were indeed a cause of damages to TFNB, the focus of the present lawsuit was Ng's activities that might have proximately caused certain damages. Ng is the one who allegedly failed to disclose material information and allegedly made misrepresentations. The question is whether he engaged in the alleged conduct and whether it was a proximate cause of TFNB's damages. The jury answered "yes" to both questions.[21] The *Peeler* opinion involved a malpractice claim by a criminal defendant against his defense attorney. 909 S.W.2d at 495–96. The court in *Peeler* recognized that there can be more than one proximate cause of damages but explained that public policy required a rule that a convicted criminal defendant's "damages" are caused by his own conduct as a matter of law unless and until his innocence is later established. *Id.* at 495–98. Thus, the *Peeler* case provides no support for Ng's argument.[22]

■ Lastly, Ng contends that TFNB has not shown that its reliance on his alleged misrepresentations was justifiable.[23] However, the jury charge on fraud did not require TFNB's reliance to be reasonable or justifiable. Ng did not ob-

---

**21.** As mentioned above, there was evidence that the board of directors would have acted very differently in regard to Alyna and probably would have shut down the accounts if they had known the truth about the credit and Alyna's misuse of money orders.

**22.** Ng additionally argues that he could not be held liable for Alyna's fraud without having been shown to have acted as Alyna's agent, citing *Cimarron Insurance Co. v. Southwestern Indemnity Co.*, 161 Tex. 516, 344 S.W.2d 442, 445–46 (1961). However, as explained above, TFNB did not sue Ng for Alyna's fraud, it sued him for his own fraudulent actions (*i.e.*, misrepresentations and failure to disclose material facts). Ng does not other-

wise cite the record or authority or make arguments regarding Alyna being the sole proximate cause of TFNB's damages.

**23.** Ng's basic argument here is that several other people at TFNB knew about the overdrafts and the FFP problems, and thus, TFNB was not justified in relying on Ng's representations. However, Ng does not claim that anyone else at TFNB knew the true nature of the money orders on which he gave immediate credit, and, as discussed above, there was testimony that in the banking industry it is reasonable for officers and directors to rely on the loan officer in charge of an account for information on that account.

ject to the charge on this ground and makes no argument that it was a deemed element. *See Osterberg*, 12 S.W.3d at 55; *Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours and Co.*, 118 S.W.3d 929, 932 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Accordingly, Ng has waived this contention.[24]

### 4. Conclusion

We find that the evidence was legally and factually sufficient to support the conclusion that Ng committed fraud against TFNB by (1) failing to disclose a material fact resulting in losses in the FFP litigation and (2) making a material misrepresentation that resulted in overdraft losses on the Alyna accounts. Accordingly, we overrule Ng's first issue.

### B. Fiduciary Duty

In his second issue, Ng attacks the legal and factual sufficiency of the evidence to support the jury's breach of fiduciary duty finding. The record reflects, however, that the trial court based its judgment against Ng solely on the fraud findings and not on the breach of fiduciary duty findings. TFNB did not attack this holding in the trial court and does not do so on appeal. Because we uphold the judgment based on the fraud finding, we need not address any issues related to the breach of fiduciary duty claim against Ng. Accordingly, Ng's second issue is overruled as moot.

### III. Wu's Liability

In his sole issue, Wu contends that the evidence is legally and factually insufficient to support the finding that he breached his fiduciary duty. Because Wu does not challenge the language of the charge on appeal, we review the sufficiency of the evidence in light of the charge as given. *Osterberg*, 12 S.W.3d at 55.[25] In

---

**24.** There appears to be some disagreement among Texas courts as to whether reliance on fraudulent misrepresentation must be justifiable in order to recover on the fraud. The Texas Supreme Court has generally not required that reliance on another party's fraud be reasonable or justifiable. *See, e.g., Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex.1998) (listing elements of common law fraud cause of action); *Koral Indus. v. Sec.-Conn. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex.1990) (explaining in the fraudulent inducement context that a victim of fraud is generally under no duty to use due diligence or proper care to discover the truth); *see also* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT PJC 105.2 & cmt. (2003) (omitting any reference to reasonableness or justifiability and concluding that it is not a required element).

However, in *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co.*, the supreme court held that when an allegedly fraudulent misrepresentation was not made to induce a particular party into an action, a party claiming fraud must show that its reliance on the statement was justifiable. 51 S.W.3d 573, 577–80

(Tex.2001). Some courts of appeal have since cited *Ernst & Young* for the proposition that common law fraud always requires a showing of justifiable or reasonable reliance. *See, e.g., Wil–Roye Inv. Co. II v. Wash. Mut. Bank, F.A.*, 142 S.W.3d 393, 411 (Tex.App.-El Paso 2004, no pet.); *TCA Bldg. Co. v. Entech, Inc.*, 86 S.W.3d 667, 674 (Tex.App.-Austin 2002, no pet.). We need not address this apparent conflict because the charge here did not require justifiable or reasonable reliance and Ng did not object or claim that it was a deemed element.

**25.** Question No. 2 charged the jury as follows:

Do you find from a preponderance of the evidence that Kenneth Wu breached his fiduciary duty to Texas First National Bank with regard to the Alyna account?
**Breach of Fiduciary Duty**

Directors and officers of a bank owe a fiduciary duty to the bank, its shareholders, depositors, and creditors. As fiduciaries, directors and officers have a duty to be diligent and prudent in managing the banks [sic] affairs. Directors and officers must handle their corporate duties with such care as an ordinary prudent man would

finding a breach of fiduciary duty, the jury essentially found that Wu failed to be diligent and prudent in managing the bank's affairs, that he failed to handle his corporate duties with such care as an ordinary prudent man would have used under the circumstances, and that his conduct did not fall within the business judgment rule. To prevail on a breach of fiduciary duty claim, a plaintiff must prove the existence of such a duty, a breach of that duty, causation, and damages. *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 508 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Wu does not dispute that he owed a duty to TFNB or that TFNB lost money on the Alyna overdrafts, but he does dispute breach and causation.[26]

The parties agree that TFNB's breach of fiduciary duty claim is based on allegations that (1) Wu usurped Kramer's authority as president and (2) Wu permitted Ng's reckless behavior in regard to the Alyna accounts. Each will be discussed in turn.

## A. Usurped Authority

 TFNB alleged that Wu usurped Kramer's authority and prevented him from properly supervising Ng and the Alyna accounts. Kramer testified that Wu once told him that his predecessor as president and CEO was just a "figurehead." Kramer stated that he did not have the authority to fire Ng nor could he hire part-time help when needed, and all expenses had to be approved by the executive committee, which he said usually fell in line with Wu.[27] Wu's own banking expert, Rusty Williams, acknowledged that these restrictions would not be consistent with a CEO's having the necessary authority to do his job. Kramer further stated that Wu decided to fire a loan assistant at one of the branches without consulting or explaining the decision to Kramer. Wu apparently formed a personnel committee

have used under similar circumstances. A breach of fiduciary duty consists of any failure to comply with such standards.

A director or officer of a bank, however, shall not be held liable if his conduct falls within the business judgment rule as defined in these instructions.

**Business Judgment Rule**

You are instructed that a director or officer of a bank shall not be liable for claims against him if, in the discharge of his duties, he exercised ordinary care and acted in good faith and honestly exercised his best business judgment within the limits of the actual authority of his position with the bank. A director or officer of a bank shall not be liable for honest mistake of judgment if he acted with due care, in good faith, and in furtherance of a rational business purpose.

You are, further, instructed that a director or officer who, in performing his duties and functions, acts in good faith and reasonably believes that reliance is warranted is entitled to rely on information, including an opinion, report, financial statement or other type of statement or financial data, decision, judgment, or performance, prepared, presented, made or rendered by:

(1) one or more directors, managers, managing participants[,] officers, or employees of the depository institution, or of an entity under joint or common control with the depository institution, who the director or officer reasonably believes merit confidence; or

(2) legal counsel, a public accountant or another person who the director or officer reasonably believes merits confidence.

26. At no point does Wu state that he appeals from Question no. 4, the damages question, which included a proximate cause instruction, but his arguments make clear that he is contesting causation as well.

27. Wu contends that Kramer testified that the executive committee was independent of Wu, but what Kramer actually said was "it's usually a majority on that committee that supports [Wu], so he pretty much can rule in any fashion he wishes."

without including Kramer, and when Kramer complained, Wu added him to that committee but then split off an "examining committee," again excluding Kramer.[28] Gregory Lueb, a TFNB senior vice-president, who testified as both a fact and expert witness, stated that after the split the examining committee should not have ordinarily gotten involved in personnel decisions; however, committee meeting minutes demonstrate that it made numerous personnel decisions, including the decision to grant a bonus to Ng and two others, the amount of which was to be determined by Wu.[29] Lueb concluded that Kramer's authority was being taken away. After its annual inspection of TFNB in 1998, the Office of the Comptroller of the Currency told the bank that it needed to give its officers sufficient authority to do their jobs.

Various other witnesses testified regarding Wu's authority and Kramer's apparent lack thereof. Michael Klobosits, TFNB's internal auditor, testified that it seemed at times that the president had less authority than he once did and that the chairman or the executive committee was running certain issues. Carol Chiu, a TFNB director and member of the executive committee, stated that she didn't think Kramer had any influence on what happened in the executive committee or the board and that Kramer acted like "Wu [was] the controller." David Wang, a former TFNB chief lending officer and acting president, stated that neither he nor Kramer had any authority as president and that Wu and the vice chairman, Milton Yang, were making the day-to-day decisions for the bank when Wu was chairman. Wang further stated that Wu told him Kramer was hired to be a "yes man." Rhonda Hudson, owner of an independent company hired to investi-

gate the handling of the Alyna accounts, stated that through her dealings with TFNB, she came to the understanding that "[p]retty much everything was decided by Mr. Wu." She further said that she was "not sure Kramer had a great deal of authority." There was also testimony from Lueb, the senior vice-president, that Ng told him that Wu, not Kramer, was actually running the bank.

There was also testimony that Wu took an unusually active roll in lending decisions. Sherry Miles, a former TFNB executive vice-president, testified that Wu personally made decisions about loans on which she was the loan officer. Kramer testified that he frequently observed Wu talking to loan officers in their offices, apparently about loan customers, with loan files open on their desks.

Kramer was also given two sets of "Executive Orders" from Wu without Kramer's having had any input in them. Wu contends that these orders were issued by the executive committee, but both documents are from Wu to Kramer, and, although one of them does indicate that the committee had approved the orders, the other document does not reference any committee approval. These documents list a series of actions for Kramer to take, mostly regarding individual personnel assignments but also canceling the purchase of a new phone system and combining two departments into one. There was testimony from several sources that the issuance of such executive orders by a bank chairman to a bank president and CEO would severely undercut the president and CEO's authority.

In response to this evidence, Wu primarily points out that except for complaining that he was not on the personnel commit-

---

**28.** Williams, Wu's expert, opined that bank presidents are typically not included on personnel committees.

**29.** The amount of the bonus, however, was later approved by the board of directors.

tee, Kramer apparently never complained to Wu about his lack of authority. However, this failure to complain does not negate the considerable evidence that Wu usurped Kramer's authority. Assuming, as the evidence strongly suggests, that Wu did deprive Kramer of authority, the jury could have easily inferred that Wu knew what he was doing, and that any objection on Kramer's part would have been unavailing. Further, there was testimony that Kramer did complain about his lack of authority to others.

Wu additionally cites scattered pieces of evidence to show that Kramer did have some authority in the bank and that he attempted to control Ng at times. Although this is some evidence that Kramer had sufficient authority, it is anecdotal and far from conclusive.

Wu also points out that there is no mention in the executive committee minutes, the OCC reports, or the Hudson Report[30] regarding Wu's taking Kramer's authority. However, as mentioned above, the OCC cautioned TFNB to give its officers sufficient authority to do their jobs, and Hudson herself testified that it appeared to her that Wu was in charge. In summary, there was significant evidence that Wu usurped Kramer's authority as president and CEO.

### B. Ng's Reckless Behavior

 TFNB further alleged that, having supplanted Kramer's authority, Wu's conduct permitted Ng's reckless behavior, which resulted in the Alyna overdraft losses. Kramer testified that he had a conversation with Ng in which he (Kramer) expressed his concerns regarding the overdrafts and asked "when do we pull the plug? How long do you go on allowing this, especially when we know the custom-er has problems[?] So how long do you throw good money after bad money?" and Ng responded that he was discussing the matter with Wu. Kramer further testified that he warned Wu on several occasions that Ng was being reckless in relation to the Alyna accounts. Kramer said that Wu responded with statements like "I know" and "I know what you mean" and by nodding his head. Kramer interpreted these responses as an indication that Wu heard and understood him and that the rest was up to Wu. There was also evidence that Wu knew Kramer did not speak Chinese, but during executive committee meetings when the issue of Alyna came up, Wu would sometimes speak in Chinese to Ng in front of Kramer. Furthermore, Lueb, testifying as both a fact and an expert witness, concluded that Wu should be held liable because he knew of Ng's conduct, knew that it constituted a variance to the bank's lending policy, and yet did nothing to stop it. Based on this evidence, it was reasonable for the jury to conclude that, because of Wu's usurpation of Kramer's authority and his dealing directly with Ng regarding the Alyna accounts, Wu's conduct permitted Ng to operate recklessly in regard to the Alyna accounts.

In response, Wu argues that because he did not have "full knowledge" of the problems with the Alyna accounts he cannot be held liable for the damages resulting from Ng's conduct. He does not, however, offer any authority suggesting that because a tortfeasor doesn't have "full knowledge" of the ramifications of his tortious acts he cannot be held liable for those acts. The charge on breach of fiduciary duty does not mention "full knowledge" but instead emphasizes diligence and prudence, "due care," "good faith," and "a rational business purpose." The jury found that Wu's

---

**30.** The Hudson Report was the result of an investigation by an outside group into the Alyna accounts.

conduct did not meet these criteria. Wu acknowledged that he knew Alyna was a problem customer, was suspected of kiting checks in the past, and had caused the bank to be sued, and Ng was allowing overdrafts far beyond his limits. Yet, despite this knowledge, Wu prevented Kramer from properly supervising Ng and apparently did nothing to rein in Ng himself.[31]

Lastly, Wu argues that the conduct of Kramer and Tsao is relevant to determining whether he breached his fiduciary duty. Clearly, the jury considered their conduct because it found that each of them breached their fiduciary duty to TFNB.[32] Wu's argument that the conduct of Tsao and Kramer somehow exonerates him is not well-founded. Wu basically claims that while Kramer and Tsao were aware of Alyna's kiting, he was not. He suggests that, had he been aware, he would have handled the accounts differently. However, Wu provides no authority supporting these arguments. There was evidence that Wu possessed considerable knowledge regarding the Alyna accounts, he usurped Kramer's authority, and he dealt personally with Ng regarding the accounts. Wu offers no plausible argument how the tortious conduct of Kramer and Tsao exonerates him for his conduct.

## C. Conclusion

The evidence is sufficient to support the conclusion that Wu usurped Kramer's au-

thority as president and CEO and that he permitted Ng's recklessness in handling the Alyna accounts. Accordingly, we find that the evidence is legally and factually sufficient to sustain the jury finding that Wu breached his fiduciary duty to TFNB and that this breach proximately caused TFNB's damages. Wu's sole issue is overruled.

## IV. Ratification

In response to Question No. 7, the jury found that TFNB ratified the conduct of Wu and Ng. Apparently based on this finding, the trial court entered judgment favoring Wu on the breach of fiduciary duty claim. However, the court declined to apply the ratification finding to the fraud finding against Ng. On appeal, TFNB argues, among other things, that because the evidence is legally insufficient to support the jury's ratification finding, the court correctly disregarded the finding as it pertained to Ng but erred in refusing to disregard the finding as it pertained to Wu.[33] We agree.

Because no one objected to the submission on ratification, we review the sufficiency of the evidence in light of the charge as given. *See Osterberg,* 12 S.W.3d at 55; *Tractebel,* 118 S.W.3d at 932. Question No. 7 read as follows:

> Did Texas First National Bank ratify the conduct of either Herbert Ng or Kenneth Wu or both?

31. Although Ng and Wu both denied that they conferred privately regarding the Alyna accounts, there was testimony from at least two other witnesses that they did in fact confer privately regarding these accounts, and Wu admitted that he told Ng to make sure the Alyna accounts were okay before he, Ng, went on vacation. The jury was entitled to consider these alleged private conversations in assessing Wu's conduct.

32. Wu was not included in the comparative responsibility question, only Ng, Tsao, and

Kramer were. TFNB suggests that this is because Wu did not request inclusion in the question, and there is no other explanation in the record.

33. TFNB makes this argument in its first issue in its Appellant's Brief against Wu, and it makes the argument in its Appellee's Brief in response to Ng's argument that the court erred in not applying the ratification finding to the fraud finding.

A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied.

Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

The jury answered "yes" as to both Ng and Wu. Because the charge treats express and implied ratification in somewhat different terms, we shall discuss each separately.[34]

### A. Express Ratification

■ The charge does not define "ratify," "ratification," or "express ratification,"

so we look to the usual meanings of those terms. "Ratification" is defined as "[t]he act of ratifying or the condition of being ratified." THE NEW AM. HERITAGE DICTIONARY 1028 (2d College Ed.1991). "Ratify" means [t]o give formal sanction to; approve and so make valid." *Id.* "Express" has multiple meanings as an adjective, including "[d]efinitely and explicitly stated," and "[p]articular; specific." *Id.* at 478. Accordingly, "express ratification" of another's conduct means a definitely and explicitly stated formal sanction or approval that validates the conduct.

■ Wu emphasizes the fact that the charge defined implied ratification as requiring full knowledge of the conduct being ratified but did not define express ratification as requiring full knowledge.[35] In other words, Wu would define express ratification as any indicium of ratification regardless of whether the ratifier knew

**34.** This submission of the ratification issue is almost verbatim the instruction contained in the Texas Pattern Jury Charges. COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES PJC 101.5 (2002). The PJC in turn pulled much of the language from *Land Title Co. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756–58 (Tex.1980). The concept of ratification has many potential applications in various fields of law. *See, e.g., Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex.2000) (discussing ratification in the context of fraudulent inducement of a contract); *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 552 n. 9 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (discussing ratification of the acts of a stranger); *Gen. Dynamics v. Torres*, 915 S.W.2d 45, 51 (Tex.App.-El Paso 1995, writ denied) (discussing ratification that may occur when a corporate director or officer benefits from a transaction with the corporation). The *Land Title* case involved an agency context and whether the principle ratified the agent's conduct by retaining the benefits of the transaction. 609 S.W.2d at 756–58. While we do not quibble with the court's application of the law under the circumstances of that case, it appears to be a poor choice on which to base a general purpose

ratification submission. In doing so, the Committee on Pattern Jury Charges has essentially disregarded the comprehensive and useful discussion of ratification contained in the Restatement of Agency and other useful Texas law. *See generally Disney Enters., Inc. v. Esprit Fin., Inc.*, 981 S.W.2d 25, 31 (Tex. App.-San Antonio 1998, writ dim'd w.o.j.); RESTATEMENT (SECOND) OF AGENCY §§ 82–104, et al (1958). A more useful, general purpose definition of the legal concept of ratification can be found in these other sources, to wit: the adoption or confirmation by a person with knowledge of all material facts of a prior act that did not then legally bind him and that he had the right to repudiate. *Willis v. Donnelly*, 118 S.W.3d 10, 26 (Tex.App.-Houston [14th Dist.] 2003, pet. filed); *Samms v. Autumn Run Cmty. Improvement Ass'n*, 23 S.W.3d 398, 403 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *Disney Enters.*, 981 S.W.2d at 31; RESTATEMENT (SECOND) OF AGENCY §§ 82, 91.

**35.** Except for making arguments that duplicate arguments made by Wu, Ng basically adopts Wu's arguments regarding ratification. Accordingly, we address ratification as it pertains to Ng and Wu together.

what he, she, or it was ratifying.[36] Yet Wu does not attempt to explain how someone could expressly ratify (meaning a definitely and explicitly stated formal sanction or approval of) another's conduct without full knowledge of that conduct. Logically, a definition of express ratification, given the context of its use in the charge and the common definition set forth above, includes *full knowledge* because the term itself denotes that the ratifier has full knowledge of what he, she, or it is ratifying. Thus, we interpret the charge as requiring full knowledge as an element of express ratification. This interpretation comports with the common definitions of the words, parallels the definition of "implied ratification" given in the charge, and comports with the accepted law of ratification. *See Samms*, 23 S.W.3d at 403.[37]

Wu and Ng allege that TFNB expressly ratified their conduct on several occasions, specifically when (1) TFNB shareholders voted at their annual meetings in 1999 and 2000 to ratify and affirm "the actions adopted by the Board of Directors and officers during the past year"; (2) the board of directors "approved" the monthly Overdraft Reports, which included notation of the Alyna overdrafts; (3) the board of directors "approved" the monthly Watch List Reports, which included the so-called "action plan" for dealing with Alyna's debt[38]; (4) the executive committee approved certain exceptions to the TFNB lending policy in regard to a proposed consolidation loan for Alyna[39]; and (5) the

36. Wu appears to reduce "express" to mean "verbal" and "implied" to mean "nonverbal," but he offers no support for these definitions either generally or in this context.

37. The critical factor in ratification cases is whether the allegedly ratifying party had full knowledge at the time of the alleged ratification and what it did in light of that knowledge. *Land Title Co.*, 609 S.W.2d at 756.

38. There is considerable disagreement in the briefing as to whether the monthly approval of the Overdraft and Watch List reports constituted *approval of the preparation and form* of the reports or the *actions underlying* the reports. The evidence in the record is ambiguous on this point. Wu testified that the board approved of the overdrafts, but he suggests in some places that this approval came in the form of silence, and in others, he suggests there might have been a formal vote, although he is unclear on any dates, and there is no such evidence in the record. TFNB contends that the board did not make credit decisions unless the transaction involved a board member and that the proper way for the executive committee to approve an overdraft would have been for a request to be submitted to the committee and approved and signed by the chairman; no such approval exists in the record. Wu's own expert witness testified inconsistently on the issue of whether approval of the reports constituted approval of the underlying actions, and Wu himself conceded that the listing of loan delinquencies in the Watch List reports did not result in approval of those delinquencies.

39. The executive committee approved a consolidation loan for Alyna and a related "Lending Policy Non–Compliance Justification Form." The form was apparently necessary because the loan violated TFNB's lending policy in that it extended the maturity date and Alyna had not provided current financial statements. Nevertheless, Wu asserts that, in approving the Form, the committee also approved the Alyna overdrafts that the loan was intended to consolidate. His only citation for this conclusion is to testimony stating that, generally, if there was to be a policy exception, it would first be discussed with the committee and approved or denied by them. This testimony says nothing about what happened in regard to this particular Form. Attached to the Form are loan documents, including a worksheet that references that the loan was to allow Alyna to restructure its "debts and overdrafts." In approving the Form, it thus appears that the committee was simply approving a loan that violated the lending policy. There is no indication that such approval was intended as approval of the prior overdrafts. Restructuring of an existing debt would not seem to ratify conduct that caused the debt to begin with. *Cf. Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 764–66 (Tex.App.-Texarkana 1992, writ denied) (holding that ratification of a subsequent agreement did not ratify prior

executive committee reviewed and discussed the executive orders issued by Wu.[40]

■ Regardless of whether any of these acts could have constituted ratification of Ng's or Wu's conduct had there been proof of full knowledge at the time of the acts, we find that there is no evidence in the record that full knowledge was possessed at the time of the alleged ratifications. Wu and Ng emphasize that the fact of the overdrafts was well known and that ratification of these overdrafts ratified the conduct that resulted in the overdrafts. However, ratification of the results of conduct without full knowledge of the conduct does not constitute express (or implied) ratification of the conduct. *See Spangler v. Jones*, 861 S.W.2d 392, 394–96 (Tex. App.-Dallas 1993, writ denied) (holding that principal's ratification of contract did not ratify agent's conduct in negotiating the contract)[41]; *Vessels*, 823 S.W.2d at 764–66 (holding that ratification of a subsequent agreement did not ratify prior tortious conduct). Even assuming that the shareholders, board members, and executive committee members approved or ratified the overdrafts, such action does not constitute ratification of Ng's or Wu's conduct, which the jury found caused the losses on the overdrafts. The evidence supports the conclusion that Ng proximately caused a portion of TFNB's losses by making fraudulent misrepresentations and by fraudulently failing to disclose material facts. The evidence further supports the conclusion that Wu proximately caused a portion of the overdraft losses when he breached his fiduciary duty by usurping Kramer's authority and permitting Ng's reckless behavior. Neither Ng nor Wu point to any evidence that the shareholders, the board of directors, or the members of the executive committee knew about Ng's fraudulent conduct or Wu's breach of fiduciary duty at the time of the alleged acts of ratification.[42]

---

**40.** The executive orders were just a small portion of the evidence demonstrating that Wu usurped Kramer's authority.

**41.** Our citation to *Spangler* in this limited context should not be read as an adoption of TFNB's argument that a breach of fiduciary duty can never be ratified. *Compare Spangler*, 861 S.W.2d at 394–96, *with Miller v. Kennedy & Minshew*, 142 S.W.3d 325, 344 n. 53 (Tex.App.-Fort Worth 2003, pet. denied) (limiting *Spangler* to its facts). Because of our disposition of this case, we need not address that particular assertion.

**42.** There was evidence that the board and executive committee knew that Alyna was having difficulty paying on its loans, that overdrafts were being given to Alyna in excess of Ng's authority to do so, that Alyna had been suspected of kiting in August 1998 (although an investigation revealed no evidence of kiting at that time), and that Alyna had tortious conduct). Ultimately, the loan was never funded, apparently because Alyna's debt grew out of control before the loan could be funded.

been sued by FFP (the money order company). There was also evidence that in February 1999, the board became aware that Alyna was again suspected of check kiting. However, there was no evidence that: the shareholders, board, or executive committee knew during the relevant time period about the full nature of Alyna's conduct regarding the money orders (*e.g.*, that the money orders were not paid for and that many were made out to Alyna or affiliated entities); the shareholders, board, or executive committee knew that the provisional credit mentioned in the September Watch List was based in part on the suspect money orders; or the board or committee knew that Ng had made misrepresentations to them and had failed to disclose other material information, that Wu had usurped Kramer's authority and permitted Ng's reckless behavior regarding the Alyna accounts, or that Ng was giving overdrafts and immediate credits to Alyna while Alyna was writing checks to affiliated entities. Wu and Ng base much of their knowledge arguments on the monthly Overdraft and Watch List Reports received by the board, but nothing in those reports for the relevant time periods indicated any wrongdoing on behalf

Indeed, in his briefing, Wu concedes that the board and the committee did not possess full knowledge regarding the Alyna accounts and would have reacted differently had they known. Wu states: "The evidence was uncontroverted that Wu was not aware of all material information when he was voting on the handling of the Alyna accounts. The [board of directors] depends on the information it receives to make decisions. The [board] and the [executive committee] were making decisions without full knowledge of what was happening in the Alyna account.... [If the board and committee had the material information] the Alyna accounts would have been handled much differently and probably shut down immediately." [43] We could not have said it better ourselves. [44]

Because there is no evidence that at the time of the alleged ratifications any of the alleged ratifiers had full knowledge of Ng's

or Wu's conduct that proximately caused the overdraft and FFP lawsuit losses, we find that the evidence is legally insufficient to sustain a finding that TFNB expressly ratified Ng's or Wu's conduct resulting in those losses.

## B. Implied Ratification

Regarding implied ratification, Wu and Ng allege that TFNB impliedly ratified their conduct because members of the board of directors and the executive committee knew that the Alyna overdrafts were occurring, yet they approved the Overdraft Reports and the so-called "action plan" and no one objected to the overdrafts. [45] However, the definition of "implied ratification" used in the charge clearly required "full knowledge" of the conduct being ratified before ratification could occur. As explained above regarding express ratification, there is no evi-

of Wu or Ng; thus, they constitute no evidence that the board had knowledge of such wrongdoing.

43. In making these statements, Wu stresses that Kramer and Tsao had information that they did not convey to the board, but the statements appear equally applicable to the information regarding Wu's and Ng's conduct. There was evidence that the board and executive committee would have acted very differently and probably would have shut down the accounts if they had known the truth about the credit and Alyna's misuse of money orders.

44. At one point, Wu suggests that the corporation viewed as an entire entity had full knowledge because certain officers of the corporation had certain pieces of knowledge, specifically Kramer, the CEO and president, and Tsao, the head cashier. If adopted, Wu's argument could swallow the tort of breach of fiduciary duty whole. The only logical rule is that the person or body ratifying the conduct must be the one with full knowledge; otherwise, someone who breaches his fiduciary duty could simply tell one officer or director the truth about his actions and then request approval from the board or the shareholders

without anyone else being informed about the true nature of his actions. *See Samms,* 23 S.W.3d at 403 (defining ratification as the adoption or confirmation *by a person with knowledge of all material facts* of a prior act that did not then legally bind him and that he had the right to repudiate). Accordingly, we find no merit in this argument irrespective of whether Kramer and Tsao could collectively be held to have had full knowledge of Ng's or Wu's conduct.

45. TFNB suggests that silence could never express the level of intent required for ratification. However, several cases have indicated that ratification can occur through a party's silence when it has full knowledge of the facts and its silence clearly indicates affirmance. *See, e.g., Southwestern Bell Tel. Co. v. Wilson,* 768 S.W.2d 755, 764 (Tex.App.-Corpus Christi 1989, writ denied); *Diamond Paint Co. v. Embry,* 525 S.W.2d 529, 535 (Tex.App.-Houston [14th Dist.] 1975, writ ref'd n.r.e.). Further, the Restatement supports the concept that silence under circumstances where a principal would naturally be expected to speak if it did not consent to an agent's action is evidence on which consent can be inferred. RESTATEMENT (SECOND) OF AGENCY § 94 & cmt a.

dence that the board of directors or the executive committee obtained full knowledge of Wu's or Ng's conduct until well after the alleged acts of ratification.

Accordingly, we find that the evidence was legally insufficient to support the ratification finding. Thus, the trial court correctly disregarded the ratification finding in regard to the fraud finding against Ng, but the court erred in applying the ratification finding to negate the breach of fiduciary duty finding against Wu. Consequently, the court also erred in awarding a take nothing judgment in favor of Wu and in awarding indemnification to Wu.

## V. Jury Question

 In his fourth issue, Ng contends that the trial court erred in refusing to submit a jury question concerning TFNB's contributory negligence. When a party complains of error in the omission of an instruction that he relies upon, he must complete three steps to preserve error: (1) tender a properly-worded proposed instruction in writing and prior to submission, (2) specifically object to the omission, and (3) obtain a ruling from the court. *Riddick v. Quail Harbor Condo. Ass'n, Inc.*, 7 S.W.3d 663, 674–75 (Tex.App.-Houston [14th Dist.] 1999, no pet.). The reporter's record indicates that Ng requested an addition to the charge regarding TFNB's contributory negligence and that the trial court denied the request. However, the requested charge itself is not contained in the record, either in the clerk's record or dictated into the reporter's record. Consequently, it is impossible to tell whether the issue was submitted in substantially correct form. Accordingly, the issue is waived. TEX.R. CIV. P. 278; *Garza v.*

*Southland Corp.*, 836 S.W.2d 214, 218 (Tex.App.-Houston [14th Dist.] 1992, no writ).

## Conclusion

In summary, we hold that the ratification finding was not supported by legally sufficient evidence but the findings of fraud against Ng and breach of fiduciary duty against Wu are supported by legally and factually sufficient evidence. Further, Ng's charge issue was waived. Because of our disposition of these issues, we need not consider the parties' remaining issues; thus, they are overruled as moot. Accordingly, we affirm the trial court's judgment as it pertains to Ng but reverse that portion of the judgment favoring Wu. We further sever the portion of the judgment concerning Wu and remand for entry of a new judgment in accordance with this opinion.[46]

## SUPPLEMENTAL OPINION ON MOTIONS FOR REHEARING

 Both Kenneth Wu and Herbert Ng filed motions for rehearing. In his motion, Ng requested that we consider a supplemental clerk's record that was filed on April 5, 2005. He contends that this supplemental record contains a proposed jury charge submission that was not included in the original clerk's record or the multiple prior supplemental clerk's records. In our original opinion, we found that Ng waived his argument regarding the trial court's refusal to submit the charge issue because the record did not contain a proposed submission in substantially correct form. *See* TEX.R. CIV. P. 278; *Garza v. Southland Corp.*, 836 S.W.2d 214,

---

46. On remand, the trial court should consider any applicable settlement credits and the calculation of interest on the judgment. *See*

*Crown Life Ins. v. Casteel*, 22 S.W.3d 378, 392 (Tex.2000) (remanding to the trial court for application of settlement credit).

218 (Tex.App.-Houston [14th Dist.] 1992, no writ).

We now refuse to consider the supplemental record and overrule the motions for rehearing. Ng failed to ensure that the proposed submission was timely filed with the record on appeal. *See generally* Tex. R.App. P. 34.5 (governing supplementation of the record). He should have done so when he raised the charge issue in his appellant's brief on February 27, 2004. He could also have done so when Texas First National Bank pointed out in its appellee's brief, filed on April 15, 2004, that the record did not contain the alleged proposed charge. We may have even considered the proposed charge had it been filed by the time of submission on October 12, 2004. *See Worthy v. Collagen Corp.*, 967 S.W.2d 360, 366 (Tex.1998) (stating that after submission an appellate court has more discretion to deny supplementation of the record). However, the record was not supplemented until more than a month after our opinion issued on March 3, 2005. *See id.* (holding that appellate court did not abuse its discretion in denying supplementation of record after its opinion issued). To allow such free supplementation of the record would cause undue delay and segmentation of the appellate process and would invite document fabrication.

The motions for rehearing are overruled.